# 19MAG 8641 ORIGINAL

Approved: _____
            GILLIAN GROSSMAN
            Assistant United States Attorney

Before:    THE HONORABLE JAMES L. COTT
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :    **SEALED COMPLAINT**
                                    :
          - v. -                    :    Violations of
                                    :    18 U.S.C. §§ 371, 1546
ZHONGSAN LIU,                       :
                                    :    COUNTY OF OFFENSE:
                    Defendant.      :    NEW YORK

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          ERIN PROPERSI, being duly sworn, deposes and says that she is a Special Agent at the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE

### Conspiracy to Commit Visa Fraud

          1.    From in or about 2017, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York and elsewhere, ZHONGSAN LIU, the defendant, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, Title 18, United States Code, Section 1546(a).

          2.    It was a part and an object of the conspiracy that ZHONGSAN LIU, the defendant, and others known and unknown, knowingly made under oath, and under penalty of perjury under Title 28, United States Code, Section 1746, knowingly subscribed as true, false statements with respect to material facts in applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder, and knowingly presented such applications, affidavits, and other documents which contained such false statements and which failed to contain any reasonable

1

basis in law and fact, to wit, LIU participated in a scheme to submit to the U.S. Department of State information in support of visa applications for employees of the government of the People's Republic of China (the "PRC Government") that LIU knew contained materially false and fraudulent statements.

## Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, ZHONGSAN LIU, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about February 6, 2018, LIU traveled through Manhattan to a particular U.S. university in Massachusetts in order to arrange for that university to sponsor a visa for a PRC Government employee to come to the United States as a visiting research scholar, when, in truth and in fact, the PRC Government employee's primary purpose in the United States would consist of working full-time for the PRC Government rather than conducting research at the sponsoring university.

b. On or about July 17, 2018, LIU placed a phone call to his colleague, a PRC Government employee, and instructed her to visit a particular U.S. university in order to bolster the false impression that his colleague was conducting research at the university in compliance with her visa requirements, rather than working full-time for the PRC Government in the United States.

c. On or about November 21, 2018, LIU met with a PRC Government official at the PRC Government's Consulate General in Manhattan to provide information and receive advice regarding the procurement of a U.S. visa for a PRC Government employee.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges, are, in part, as follows:

4. I have been a Special Agent with the FBI since approximately. 2016. I am currently assigned to the Counterintelligence Division within the FBI's New York Field Office. The focus of my counterintelligence efforts has been on investigating the economic espionage and foreign intelligence activities conducted by the PRC Government, and in particular the PRC Government's efforts to recruit experts and gather technology from the United States to further its economic and technological

2

objectives. I have learned the facts contained in this Complaint from, among other sources, my personal participation in this investigation, my discussions with other law enforcement agents and FBI personnel, and my review of documents and other materials. In addition, and among other things, I have reviewed emails and recorded phone calls that the FBI has lawfully obtained in the course of this investigation. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of this investigation. Further, any statements related herein are described in substance and in part only.

5. As set forth in greater detail below, based on my involvement in this investigation, conversations with other law enforcement officers and FBI personnel, and review of documents and other evidence, I have learned that ZHONGSAN LIU, the defendant, works for the PRC Government in the United States; specifically, LIU works for the China Association for International Exchange of Personnel ("CAIEP"). CAIEP is a PRC Government agency that, among other things, recruits U.S. scientists, academics, engineers, and other experts to work in China. In order to expand CAIEP's personnel and further the PRC Government's talent-recruitment objectives in the United States, LIU and his co-conspirators sought to fraudulently procure visas for CAIEP employees to enter the United States from China. In particular, LIU worked with others to arrange for U.S. universities to sponsor J-1 visas for CAIEP employees to come to the United States as purported "research scholars." LIU did so with the knowledge that, once in the United States, the CAIEP employees would not in fact principally conduct research on behalf of their sponsoring universities but rather would work full time for CAIEP.

## Background on the PRC Government's Talent-Recruitment Objectives

6. I have had numerous conversations with an FBI intelligence analyst ("Analyst-1") who has developed expertise in the PRC Government's talent-recruitment programs. Analyst-1 developed that expertise through years of research, participation in numerous investigations involving the PRC Government's talent programs over the past 14 years, and review of open-source reporting regarding the PRC Government's talent-recruitment activities. In addition, Analyst-1 has served as a nationwide resource for FBI personnel investigating the operation of the PRC Government's talent programs in the United States. Based on my conversations with Analyst-1, as well as my own training, experience, involvement in investigations related to the PRC Government's talent-recruitment activities, review of open-source

3

reporting and other materials, and conversations with other law enforcement officers, I have learned the following:

a. In or around 2008, the PRC Government launched a talent-recruitment program officially known as the "Recruitment Program of Global Experts," commonly referred to as the "Thousand Talents Plan." The Thousand Talents Plan aims to recruit overseas scientists, engineers, and other experts to work for businesses, research institutes, and government agencies in China, with the goal of utilizing those experts to further the PRC Government's strategic national development goals.

b. Thousand Talents Plan recruits typically sign contracts that detail the specific research the recruit will perform or the business the recruit will develop in China. That contractual obligation often resembles or even replicates the work the recruit performs or performed for his or her U.S.-based or other overseas employer, thereby leveraging the recruit's knowledge and access to intellectual property obtained from U.S. and foreign businesses and government laboratories.

7. Based on my training, experience, involvement in this investigation, including conversations with Analyst-1, and review of open-source materials, I have learned that the PRC Government operates the State Administration of Foreign Experts Affairs ("SAFEA"). As set forth in more detail below, SAFEA is a PRC Government agency responsible for, among other things, the recruitment of overseas talent and experts to work in China.

a. Through my review of SAFEA's English-language website, I have learned that SAFEA describes itself as an entity "responsible for certifying foreign experts to work in the Chinese mainland and organizing overseas training for Chinese technical and managerial professionals." SAFEA's website further indicates that SAFEA is a PRC Government agency. For example, SAFEA's website describes its operations as, among other things, "examining and approving key plans financed by special state funds for employing overseas experts, and coordinating the implementation of such state plans"; and "[u]ndertaking other matters assigned by the State Council and the Ministry of Human Resources and Social Security."

b. Based on my review of SAFEA's website, I have learned that SAFEA includes CAIEP in its list of "Directly Managed Institutions" under SAFEA's control.

4

## The Defendant's Employment with CAIEP

8. Based on my training and experience, my involvement in this investigation, my review of open-source materials and other evidence, and my conversations with other law enforcement officers and FBI personnel, I am aware that CAIEP is a PRC Government agency; specifically, the overseas arm of SAFEA that works to recruit experts from the United States, among other countries, for projects and positions in China. CAIEP employees in the United States recruit experts from prestigious universities, research institutes, and other entities who can assist with the PRC Government's technological and economic development needs; collaborate with various Chinese professional organizations in the United States to promote the PRC Government's talent-recruitment policies; and assist PRC Government officials and Chinese companies with recruitment events in the United States.

9. Based on my review of records maintained by U.S. Citizenship and Immigration Services ("USCIS"), I have learned that USCIS received a letter in or about December 2018 (the "Letter") signed by the General Director of CAIEP (the "CAIEP General Director"). The CAIEP General Director submitted the Letter in support of a petition to extend the U.S. visa held by ZHONGSAN LIU, the defendant, whom the letter identified as a Chinese citizen and the "President/CEO" of CAIEP's United States branch ("CAIEP-US"). The Letter contained, among other things, the following information about CAIEP and about LIU's employment with CAIEP:

a. The Letter explained that SAFEA "is a government administrative agency of the State Council of the People's Republic of China responsible for certifying foreign experts who provide their expertise in mainland China." The Letter further explained that CAIEP "is a government agency that is part of SAFEA." CAIEP-US currently maintains offices in New Jersey, Georgia, and California. CAIEP-US's "mission centers on," among other things, "[r]ecruiting foreign experts to work in China in the fields of agriculture, industry, and commerce" and "serving as a bridge for the development of technological and trade exchange between China and foreign countries in the fields of intellectual exchange, consultation, advanced technology, and equipment importation."

b. The Letter stated that LIU "has been employed at CAIEP and SAFEA for nearly twenty-six (26) years." Before assuming his current position as "President/CEO of CAIEP-US," LIU "was employed with CAIEP in China as General Director of the

5

Secretariat of CAIEP-China." As President/CEO of CAIEP-US, LIU is based in CAIEP's office located in Fort Lee, New Jersey ("CAIEP-NY"), where he oversees "all programs organized by . . . CAIEP" in the United States.

10. Based on my review of records maintained by the U.S. Department of State (the "State Department"), I have learned that in or about early 2017, LIU applied for a U.S. visa using an official passport issued by the PRC Government to government personnel (an "Official PRC Government Passport"). LIU listed the purpose of his travel to the United States as "intracompany transferee." He identified his employer as CAIEP and his email address as an account with the domain name "safea.gov.cn." Based on my review of records maintained by Customs and Border Protection ("CBP"), I have learned that LIU received an L-1A visa[1] and entered the United States in or about March 2017, and has since resided in the United States.

11. On or about September 5, 2018, while acting in an undercover capacity, I attended a meeting of a particular professional group for mechanical engineers (the "Mechanical Engineers Group") in Manhattan. LIU attended the meeting and was introduced as CAIEP's Chief Representative in New York. SAFEA officials, as well as an official of the PRC Government's Ministry of Science and Technology ("MOST"), also attended the meeting. During the meeting, the MOST official (the "MOST Official") stated that MOST and SAFEA had recently merged. The MOST Official confirmed that both SAFEA and MOST were PRC Government agencies. While I was at the meeting, LIU handed a business card to another meeting attendee, who in turn handed the card to me. LIU's business card identified LIU as the "Chief Representative" of CAIEP-NY and listed a particular email account as his email address (the "Liu Email Account").

## CAIEP's U.S. Operations and Employee Visa Issues

12. As discussed in greater detail below, based on my involvement in this investigation, my conversations with other law enforcement officers and FBI personnel, and my review of emails

---

[1] Based on my review of a publicly available website maintained by USCIS, I am aware that an L-1A visa enables, among other things, a foreign employer—including a foreign government agency—to send an executive or manager to the United States with the purpose of establishing or working in a U.S. office.

6

and recorded phone calls,[2] I have learned that from in or about 2017 up to and including the date of the filing of this Complaint, ZHONGSAN LIU, the defendant, has worked to further the PRC Government's talent-recruitment objectives in the United States. In particular, among other things, LIU has recruited various U.S. experts for projects or positions in China; certified various U.S. universities as SAFEA training institutes[3]; and participated in science and technology conferences that provide opportunities for the recruitment of experts to work in China. While carrying out those talent-recruitment activities on behalf of the PRC Government, LIU has regularly coordinated his activities with, among others, SAFEA personnel and officials at the PRC Government's embassy in Washington, D.C. (the "PRC Embassy") and the PRC Government's Consulate General in Manhattan, New York (the "PRC Consulate"). In his communications with other PRC Government officials, LIU repeatedly has discussed the difficulty of obtaining visas for CAIEP-NY employees and, as a result, of adequately staffing CAIEP-NY.

13. On or about October 30, 2017, ZHONGSAN LIU, the defendant, received a phone call from an individual who identified himself as an employee of the PRC Embassy's Science and Technology Section ("PRC Embassy Officer-1"). PRC Embassy Officer-1 remarked that when LIU last came to the PRC Embassy, he had mentioned an "issue" pertaining to the visa of a prospective CAIEP-US employee. PRC Embassy Officer-1 asked LIU whether "the issue" was "still unresolved?" LIU explained that the U.S. Government had recently denied a visa for the prospective CAIEP-US employee and that "it is a bit problematic." LIU stated that he was considering giving a briefing to PRC Embassy Officer-1 regarding the visa issue. PRC

---

[2] All of the phone calls referenced herein were recorded and lawfully obtained by the FBI. All of the email correspondence referenced herein was sent to or from the Liu Email Account, and was likewise lawfully obtained by the FBI. The recorded conversations and email correspondence described and quoted herein were conducted in Mandarin, unless otherwise indicated. The descriptions and quotations are based on draft, preliminary translations of the conversations and correspondence, and are subject to revision.

[3] Through my training, experience, involvement in this investigation, and review of open-source materials, I have learned that when an entity is certified as a SAFEA training institute, the PRC adds the entity to an approved list of expert institutions authorized to provide overseas training for PRC officials and public servants.

Embassy Officer-1 advised LIU to report the issue "to the leaders." PRC Embassy Officer-1 further told Liu, "Let's join hands and . . . see if there is any channel to work on the American side." After discussing the visa issue, LIU and PRC Embassy Officer-1 shifted their conversation to the process of certifying a particular U.S. university as a SAFEA "training venue."

14. On or about December 23, 2017, ZHONGSAN LIU, the defendant, emailed several documents to a particular email account with the domain name "safea.gov.cn" ("SAFEA Account-1"). Based on my training, experience, and involvement in this investigation, I am aware that the "safea.gov.cn" domain name is used by SAFEA personnel. The documents in LIU's email to SAFEA Account-1 appeared to comprise CAIEP-NY's annual report for 2017. One of the documents contained a summary of activities LIU had undertaken since arriving in the United States in or about March 2017. The activities described by LIU included, among others, (i) recruiting "high-caliber experts," "professors and outstanding students" from "top-level universities," "academicians," and "Thousand Talent Plan experts"—several of whom LIU identified by name—for "work or . . . activities in China"; (ii) touring a number of particular U.S. universities and recommending that one of them be designated as a SAFEA training institute; and (iii) cultivating relationships with several professional science and technology associations, including the Mechanical Engineers Group, among others. In addition, LIU stated that he had conducted "investigative research" regarding, among other topics, visas for CAIEP-US employees and prepared a report entitled, "An Investigation Report on New York Representative Personnel Visa Issues." Based on my involvement in this investigation and LIU's placement in CAIEP-NY's office, "New York Representative Personnel" appears to refer to CAIEP-NY employees.

15. On or about January 5, 2018, LIU sent an email to an account containing the word "SAFEA" in the email address. Based on my training, experience, and involvement in this investigation, the account LIU emailed appears to belong to SAFEA personnel. LIU's email attached a report discussing, among other things, the challenge of obtaining U.S. visas for CAIEP employees. In particular, the report stated that the Science and Technology Section of the PRC Consulate had come "to realize the difficulties our personnel face in obtaining visas" and had proposed that SAFEA "apply to the State Commission Office for Public Sector Reform . . . to merge its existing authorized overseas personnel . . . into the S&T Sections of embassies and consulates general." The report further stated that the PRC Consulate's proposal would "solve[] the visa problem." The report identified the proposal's

8

disadvantage as the fact that, "as diplomatic personnel, work flexibility and independence would be severely constrained, at odds with the original intentions of setting up overseas offices of [SAFEA]." Based on my training, experience, and involvement in this investigation, the report appears to acknowledge that classifying CAIEP personnel as PRC Government diplomats would facilitate CAIEP employees' obtaining U.S. visas, though a merger with the PRC Government's embassies and consulates could undermine the scope or efficacy of CAIEP's talent-recruitment work ("work flexibility and independence would be severely constrained").

16. On or about March 13, 2018, ZHONGSAN · LIU, the defendant, placed a phone call to an individual whom he addressed by last name, using the title "Consul." Based on my involvement in this investigation, my review of the PRC Consulate's English-language website, and the title and last name LIU used to address the individual, it appears that LIU called the Chief of the Science and Technology Section of the PRC Consulate (the "S&T Chief"). During the call, LIU stated, "We will be in the same family soon," and asked whether it would be "possible for us to merge the section?" LIU then advised the S&T Chief that "we have some problems on the visas" and that "it is very difficult" to obtain U.S. visas. The S&T Chief replied, "That's right . . . . Just because of your status as an outsider, you are unable to enjoy the benefits which you deserve." LIU remarked that it "will be very good when we merge our offices together while you are still in your position." The S&T Chief agreed and stated that "[f]rom now on, we will be able to [meet] frequently." LIU observed that, "Now it is perfectly justifiable." The S&T Chief agreed and stated that "[a]s soon as the Ambassador returns, [we] will see him and give him a briefing." Based on my training, experience, and involvement in this investigation, it appears that LIU and the S&T Chief were discussing the possibility of CAIEP-NY formally merging with the PRC Consulate's Science and Technology Section, and the possibility that such a merger would facilitate visas for CAIEP-NY personnel. In addition, it appears that LIU and the S&T Chief may have been discussing the fact that when CAIEP-NY merges with the PRC Consulate, LIU will have a justification for meeting frequently with PRC Government officials in the U.S.

17. On or about June 9, 2018, ZHONGSAN LIU, the defendant, received a phone call from a man who identified himself by first and last name. Based on the name the man used, as well as my personal interactions with the MOST Official, *see supra* ¶ 11, the man who called LIU appears to be the MOST Official. During the phone call, the MOST Official told LIU that "[t]he basic plan now for the overseas establishments is merging, changing our

9

current 30 overseas establishment quotas into diplomatic quotas, that is, the Science and Technology Section of the embassy." Based on my training, experience, and involvement in this investigation, it appears that the MOST Official was advising LIU of a plan by the PRC Government to merge SAFEA and other overseas personnel with the science and technology sections of the PRC Government's embassies. The MOST Official observed that such a merger would, among other things, facilitate the "visa application[s]" of "overseas staff."

## The J-1 Visa Fraud Scheme

18. Based on my review of a publicly available website maintained by the State Department, I have learned that the J-1 visa program permits foreign nationals to come to the United States for a particular teaching, academic, research, or work program. For example, the J-1 visa Research Scholar Program allows a foreign national to enter the United States for the primary purpose of conducting research at a corporate research facility, museum, library, university, or other research institution. Applicants for a J-1 visa must submit to the State Department, among other documents, a Form DS-2019 prepared by their program sponsor. Forms DS-2019 are maintained in the Department of Homeland Security's Student and Exchange Visitor Information System ("SEVIS"), an electronic database containing information about J-1 visa holders. A J-1 Research Scholar must conduct the activity authorized by their J-1 visa program at the location or locations listed in SEVIS.[4]

19. Based on my review of records maintained by the State Department, I have learned that a particular individual ("CC-1") applied for a J-1 visa in or about April 2018 ("CC-1's 2018 Visa Application"). Based on my review of records maintained by SEVIS, I have further learned that CC-1 applied for the J-1 Research Scholar Program. CC-1's Form DS-2019 identifies CC-1's program sponsor as a particular U.S. university ("University-1"), and CC-1's "site of activity" in the United States as a particular address in Georgia (the "Georgia Address"), the state in which University-1 is located. In addition, the Form DS-2019 lists CC-1's field of research as "the administration of non-profits" and

---

[4] Based on my review of open-source materials, I have learned that a J-1 Research Scholar may receive remuneration for occasional lectures and short-term consultations at entities other than their sponsoring institution, if authorized by the sponsoring institution and as long as such lectures or consultations are incidental to the Research Scholar's primary academic activities.

lists CC-1's "position in home country" as "university teaching staff including researchers."

20. Based on my review of CC-1's 2018 Visa Application, I have learned that CC-1 listed the Georgia Address as her residence in the United States. CC-1 applied for the visa using an Official PRC Government Passport. CC-1 further identified her present employer as CAIEP and her primary occupation as "government." Through my review of State Department records, I am aware that the State Department issued a J-1 visa to CC-1 in or about April 2018, which was scheduled to expire in or about April 2019. Based on my review of records maintained by CBP, I have learned that CC-1 entered the United States on the J-1 visa in or about May 2018 and has resided in the United States since that time.

21. On or about May 2, 2018, ZHONGSAN LIU, the defendant, received a phone call from a man he addressed using a particular last name. Based on my involvement in this investigation, the last name LIU used to address the caller, and my review of open-source materials, the man who called LIU appears to be the CEO of a consulting company that specializes in academic, cultural, and professional exchanges between the United States and China ("CC-2"). The consulting company's English-language website describes it as partnering with both University-1 and CAIEP, among other entities. During the call, LIU stated, in substance and in part, that CC-1 would soon be joining CAIEP-NY as LIU's assistant. LIU explained that because CC-1 was coming to the United States "at the invitation of [University-1]," CC-1 "will definitely have to go and report [at University-1]." LIU further stated that CC-1 must, among other things, "get [a] Social Security number" and obtain her driver's license. CC-2 agreed and explained that after CC-1 reports to University-1, "she has to stay" in Georgia "for a period of time" in order to obtain a bank statement or utility bill that will prove CC-1's residence in Georgia and thereby enable her to obtain a Georgia driver's license. LIU remarked that he would tell "the Bureau" that CC-1 would have to stay near University-1 "for at least a month." CC-2 observed that, "[s]upposedly, with a J-1 visa, you can't . . . be absent for long. What's the point if you keep being absent?" LIU agreed, noting that when he was a visiting scholar, he visited his university "from time to time because . . . as a visiting scholar, [you] have subjects."[5]

---

[5] Based on my involvement in this investigation and review of records maintained by the State Department, I am aware that on or about November 14, 2001, and again on or about January 3, 2006,

11

22. From at least in or about April 2018, up to and including at least in or about June 2019, ZHONGSAN LIU, the defendant, has emailed SAFEA Account-1 a monthly report detailing CAIEP-NY's talent-recruitment activities for the preceding month (collectively, the "Work Reports"). Most of the Work Reports bear the title "Work Report," followed by "CAIEP New York Representative Office," and the date of the report. In addition to summarizing CAIEP-NY's talent-recruitment efforts, the Work Reports set forth, among other things, CAIEP-NY's progress on personnel and visa issues. For example, on or about May 3, 2018, LIU emailed SAFEA Account-1 a Work Report, dated April 30, 2018. The report documented the performance of various tasks including, among others, "[p]roactively planned for the new deputy's arrival to the U.S." Based on my training, experience, and involvement in this investigation, the "new deputy" appears to be a reference to CC-1.

23. On or about May 7, 2018, ZHONGSAN LIU, the defendant, received a phone call from a woman regarding CC-1. LIU told the caller that he had contacted CC-1, and then stated, "I don't know what the discussion was like between you and our leaders." Based on my involvement in this investigation and LIU's reference to "our leaders," the woman who called LIU appears to be his colleague ("the PRC Government Employee"). LIU informed the PRC Government Employee that it is "absolutely impossible for [CC-1] to come and test for her driver's license in New York," because "she is a visiting scholar at [University-1]," and as a result New York would not issue her a license. LIU further explained that CC-1 would be living at CAIEP-Atlanta's office, about an hour's drive from University-1, "for some time" after arriving in the United States. The PRC Government Employee told LIU, "I think the leaders understand the situation." She then told LIU that "we've been discussing with the finance department about [CC-1's] salary." LIU advised the PRC Government Employee to "[a]void trouble to the office" and "[a]void trouble to CC-1." He further noted that it was important to "comply with the U.S. requirements." The PRC Government Employee asked LIU where the money for CC-1's salary should be allotted from?" LIU replied, "just as [a] subsidy to a visitor scholar's living expenses." Based on my training, experience, and involvement in this investigation, it appears that

the State Department issued LIU a J-1 visa. Records maintained by the State Department in connection with the 2006 J-1 visa indicate that LIU was entering the United States for a five-month program at a U.S. university, and that he was employed as a "civil servant" with SAFEA.

12

LIU and the PRC Government Employee were discussing how the PRC Government could pay CC-1 for her work in the United States without revealing her employment at CAIEP-NY. In addition, LIU's reference to the importance of "comply[ing] with the U.S. requirements" appears to refer only to the superficial appearance of compliance with the J-1 visa regulations, in light of LIU's apparent intent that both CC-1 and another prospective CAIEP-NY employee work full-time for CAIEP-NY in the United States, *see infra* ¶¶ 24-46, in contravention of the J-1 visa requirements.

24. On or about June 12, 2018, ZHONGSAN LIU, the defendant, received a phone call from a woman whom he addressed using CC-1's first name. Based on my involvement in this investigation and the name LIU used, the woman who called LIU appears to be CC-1. CC-1 indicated that she would soon be taking her driver's test in Georgia.

25. On or about June 13, 2018, ZHONGSAN LIU, the defendant, received a phone call from CC-1. CC-1 informed LIU that she had passed her driver's test and that she would receive her driver's license in the mail. LIU instructed CC-1 to "start booking [her] flight" as soon as she received her driver's license. LIU further directed CC-1 to "make another trip to [University-1]" and "meet with [her] academic advisor." He urged CC-1 to "show [her] face" and to ask her academic advisor to "assign [her] a subject." LIU explained that, "[t]his way, you can get down to your own business." Based on my training, experience, and involvement in this investigation, it appears that LIU was instructing CC-1 to visit University-1 in person one more time before beginning her full-time work at CAIEP-NY in order to bolster CC-1's appearance as a purported Research Scholar at University-1.

26. On or about June 22, 2018, ZHONGSAN LIU, the defendant, placed a phone call to CC-1. During the call, LIU and CC-1 agreed that CC-1 would take a flight to New York in four days' time.

27. On or about July 17, 2018, ZHONGSAN LIU, the defendant, placed a phone call to CC-1. During the call, LIU suggested that CC-1 contact University-1 and arrange a visit for later that week. LIU explained that "it is not appropriate for you not to show up in person for over a month." CC-1 suggested that they "can meet in person periodically." LIU replied, "That's right. Because of your status, it is not appropriate if you don't show up in person." CC-1 and LIU then discussed CC-1's plans to go to Manhattan later that day. Based on my training, experience,

13

and involvement in this investigation, it appears that approximately one month after CC-1 had left Georgia for the New York area, *see supra* ¶¶ 25-26, LIU urged her to visit University-1 in order to bolster the fiction that she was a Research Scholar at University-1, rather than a full-time employee of CAIEP-NY.

28. On or about November 21, 2018, ZHONGSAN LIU, the defendant, placed a phone call to CC-1. During the call, LIU and CC-1 discussed, in substance and in part, their difficulties navigating the U.S. visa process. CC-1 told LIU that CAIEP's immigration attorney "wanted information that is hopefully detailed enough to explain the type of work in the office and in China." CC-1 observed that "saying too much is no good; but saying nothing is bad, too. . . . Because our job is to deal with talents, so it is somewhat—" CC-1 did not finish her sentence, but LIU agreed: "Right, right, right, right." CC-1 further noted that they "have to be detailed but then there are some things that can't . . . be said." LIU responded, "Right. When you give it to them and, after it is translated, they'll see that you happen to be doing what is banned in the U.S. Why should you be allowed here?" CC-1 replied, "True, because the attorney will not help us. They only translate whatever they're given." LIU then reminded CC-1 that the S&T Chief had "said that you'd better be careful, cautious for now." Based on my judicially authorized review of cellphone geolocation information, I am aware that on or about November 21, 2018, the cellphone belonging to ZHONGSAN LIU, the defendant, was present at the PRC Consulate. Based on my involvement in this investigation, LIU's reference to his and CC-1's conversation with the S&T Chief appears to refer to the meeting that took place earlier that day. In addition, based on my training, experience, and involvement in this investigation, LIU's reference to CC-1 "doing what is banned in the U.S." appears to refer to CC-1's work for CAIEP-NY, which exceeds the scope of activity authorized by her J-1 visa.

29. On or about February 6, 2019, LIU emailed SAFEA Account-1 a Work Report, dated January 31, 2019. The report documented the performance of various tasks including the following, among others: "Contacted [University-1]. Conducted early-stage research on the extension of the J1 Visa for relevant personnel. Reported Developments back to China in a timely manner." Based on my involvement in this investigation and review of records maintained by the State Department, LIU's reference to contacting University-1 and researching an "extension of the J1 Visa for relevant personnel" appears to refer to LIU and CC-1's efforts to seek an extension of CC-1's J-1 visa beyond its April 2019 expiration date.

14

30. On or about March 3, 2019, LIU emailed SAFEA Account-1 a Work Report, dated February 28, 2019. The report documented the performance of various tasks including the following, among others: "Met with [a] professional scholar of [a particular U.S. university] in Massachusetts, discuss[ed] the promotion of . . . China-US exchanges"; "Met with Director [first and last name] of [University-1] and discussed the coordination of the process for the extension of J1 visa for the related member and submitted the related materials"; [and] "Completed the filing of the 2018 taxes [for] the J1 member as requested." Based on LIU's reference to a meeting with a University-1 employee to discuss extending a "J1 visa for the related member" and the submission of "materials" related to that visa extension, it appears that CAIEP personnel met with a University-1 employee to coordinate an application to extend CC-1's J-1 visa before its expiration in or about April 2019.

31. As detailed below, based on my involvement in this investigation, conversations with other law enforcement officers and FBI personnel, and review of recorded conversations and emails in the Liu Email Account, I have learned that, acting at the direction of the PRC Government, ZHONGSAN LIU, the defendant, made repeated efforts to obtain another J-1 visa for a prospective CAIEP-NY employee (the "CAIEP-NY Hire") to enter the United States in order to work for CAIEP-NY.

32. On or about January 29, 2018, ZHONGSAN LIU, the defendant, received a phone call from a woman who informed LIU, in substance and in part, that "if he/she is in a college or university and has a Ph D degree, it will be very easy for us to give him/her a J-1 [visa]." Based on my involvement in this investigation, the caller's reference to her ability to "give" a J-1 visa, and LIU's subsequent report that the caller is affiliated with a particular U.S. university ("University-2"), *see infra* ¶ 37(c), the caller appears to be an employee of University-2 ("CC-3"). CC-3 explained that "[t]here needs to be a faculty, that is, a professor in charge to host him/her," and told LIU, "if you want to do it, you come and do it here in my place. I'll give it a try and it might work." LIU told CC-3 that they should discuss the matter when they met in person. LIU then remarked that if the J-1 visa applicant goes to CC-3's university, it "might be a bit too far to travel," and mentioned two universities located in Manhattan that he had been considering. CC-3 reiterated, "If he/she puts his/her paperwork here, we don't care if he/she is here in person, as long as he/she takes part in activities when there are any." LIU observed that the J-1 applicant would have to "[hand] in a

15

paper" on a research topic before leaving the United States. He then indicated that he would not seek a J-1 visa from University-2 "unless [he] absolutely ha[s] to, because it's too far for him/her to make the trip." Based on my training, experience, and involvement in this investigation, it appears that LIU and CC-3 were discussing the feasibility of obtaining a J-1 visa for a prospective CAIEP-NY employee through CC-3's university.

33. On or about February 23, 2018, ZHONGSAN LIU, the defendant, received a phone call from a man whom he addressed as "Chief [last name]." Based on my training, experience, involvement in this investigation, and the title with which LIU addressed the caller, the person who called LIU appears to be a PRC Government official ("PRC Government Official-1"). During the call, LIU stated, in substance and in part, that he had been tasked with helping to secure a J-1 visa for a prospective CAIEP employee but could not "find a school that can send an invitation letter." LIU explained that he wanted to find a school nearby CAIEP-NY's New Jersey office and "make an agreement so that this person will do some research over there while assisting with my work [at CAIEP-NY]." PRC Government Official-1 responded, "I really don't suggest that you do that. . . . This might easily get you in trouble." LIU replied, "Yes. But we have no other solutions. We focus on getting the visa."

34. On or about March 4, 2018, ZHONGSAN LIU, the defendant, received a phone call from the MOST Official. During the call, LIU explained, in substance and in part, that he planned to ask a particular individual to help the CAIEP-NY Hire. Based on my involvement in this investigation, I am aware that the individual LIU referenced works at a particular U.S. university ("University-3") as a professor (the "University-3 Professor"). Based on my involvement in this investigation, it appears that LIU was discussing a request to the University-3 Professor for assistance sponsoring a J-1 visa for the CAIEP-NY Hire.

35. On or about March 7, 2018, ZHONGSAN LIU, the defendant received an email from an individual with an email address that had a ".edu" domain name and contained part of University-3's name. Based on that email address, the person who emailed LIU appears to be affiliated with University-3 ("CC-4"). CC-4 wrote, in substance and in part, that he had seen the University-3 Professor earlier that day. CC-4 explained that University-3 "is not qualified to accept visiting scholars," which "will impact the chances of getting a J-1 visa successfully." CC-4 continued, however, that the Institute of Forensic Science at University-3 "is known by all the US embassies abroad. Its

16

invitation letters have never been rejected in the past. Besides, it makes sense for [the University-3 Professor] to invite [the CAIEP-NY Hire] to the institute for one year to help compile a training menu in English and Chinese." CC-4 wrote that the University-3 Professor had signed an "invitation letter . . . to be used for applying [for] a B-1 visa," for the CAIEP-NY Hire. CC-4 attached the University-3 Professor's invitation letter to the email.

36. On or about March 9, 2018, ZHONGSAN LIU, the defendant, placed a phone call to an individual with whom he had a detailed discussion about a 2015 tax audit at CAIEP-Atlanta. Based on my involvement in this investigation and the substance of LIU's discussion with the person he called, the individual LIU called appears to be a CAIEP-Atlanta employee (the "CAIEP-Atlanta Employee"). During the call, LIU informed the CAIEP-Atlanta Employee that the University-3 Professor had suggested that the CAIEP-NY Hire come to the United States on a B-1 visa. LIU further stated that it did not "make any sense" for the CAIEP-NY Hire to come to the United States on a B-1 visa, as that visa would allow the CAIEP-NY Hire to remain in the United States for only six months.

37. On or about March 12, 2018, ZHONGSAN LIU, the defendant, emailed SAFEA Account-1. LIU's email attached a document entitled, "Report on the Status of Processing Comrade [CAIEP-NY Hire]'s Invitation to the US." The report was addressed to the "Overseas Administration Division," and signed "New York Representative Office." The report included the following excerpts, in substance and in part:

a. "After receiving Comrade [CAIEP-NY Hire]'s appointment, the New York Representative Office has been consulting and contacting relevant schools for her."

b. The report continued that CAIEP-NY had initially contacted a particular U.S. university ("University-4"), "located in New Jersey. As a SAFEA channel for training, that school should be supportive of the Representative Office's work, but after repeatedly contacting . . . the person in charge of training work in that school, this person did not answer the phone or respond to text messages."

c. The report then stated that on "February 6, the Representative Office made a special trip to Boston to meet

17

with [CC-3], president of the Confucius Institute[6] at [University-2's] campus, and well known beforehand by the Office, to discuss matters concerning an application for [the CAIEP-NY Hire] to be a visiting scholar at the school." Based on my judicially authorized review of cellphone geolocation information, I am aware that on or about February 6, 2018, the cellphone belonging to ZHONGSAN LIU, the defendant, passed through Manhattan during LIU's trip from Fort Lee, New Jersey to Boston.

        d.    The report went on to note that University-2 required visiting foreign scholars to pay a fee of more than $8,000, and "it seems that SAFEA does not have any precedent for paying fees."

        e.    The report continued that the University-3 Professor had decided to invite the CAIEP-NY Hire to "assist work in his laboratory" under a B-1 visa. The report stated that CAIEP-NY "planned to wait until after [the University-3 Professor] returned" to the United States from a trip abroad to "pay him a special visit, ask him for advice, and then write up a report to China on the situation."

        f.    The report stated that "ever since the new US administration took over, it has become very strict in allowing foreign students and visiting scholars to enter the US. All schools will closely examine and check scholars coming to study; relevant letters of invitation will be rejected for those personnel whose areas of study do not match the school's requirements."

        g.    The report concluded that CAIEP-NY "will continue to seek out other schools able to invite [the CAIEP-NY Hire] to the US as a visiting scholar."

        38.   On or about March 13, 2018, ZHONGSAN LIU, the defendant, received an email from SAFEA Account-1. The email stated, "Received your Office's 3/12 Report on the Status of Processing Comrade [CAIEP-NY Hire]'s Invitation to the US." The

---

6 Based on my involvement in this investigation, conversations with other law enforcement officers and FBI personnel, and review of open-source materials, I am aware that the Confucius Institute is an organization affiliated with the PRC Government's Ministry of Education, which operates at universities in the United States and elsewhere with the stated mission of promoting Chinese cultural and language studies and academic exchanges between China and other countries.

email further stated, in substance and in part, "China is in contact with the person responsible at [University-4]. Your Office is to continue following up and communicating the status whenever necessary." The email concluded, "Your Office is to continue contacting other schools."

39. On or about April 3, 2018, LIU emailed SAFEA Account-1 a Work Report dated March 31, 2018. The report documented the performance of various tasks by CAIEP-NY personnel, including, among others: "Utilized [a particular company, hereinafter "Company-1"][7] 25th Anniversary event as an opportunity to promote talent-recruitment, broaden contacts, . . . and develop new talent resources"; and "Made every effort to contact relevant schools to find a solution to matters regarding CAIEP staff invitations to the U.S., according to China's instructions." Based on my involvement in this investigation, LIU's mention of his efforts to "contact relevant schools to find a solution to matters regarding CAIEP staff invitations" appears to refer to LIU's attempts, at the direction of the PRC Government, to arrange for a U.S. university to sponsor the CAIEP-NY Hire's J-1 visa.

40. On or about May 30, 2018, ZHONGSAN LIU, the defendant, placed a phone call. A woman (the "Woman") answered the call, and LIU asked the Woman to put the call on speakerphone so that LIU could speak with an individual whom LIU referred to as "Chief [last name]." Based on my involvement in this investigation, the last name LIU used to identify the person with whom he wished to speak, and my review of Company-1's website, the person LIU was calling appears to be the president of Company-1 ("CC-5"). During the call, LIU asked whether CC-5 "is well acquainted with" a particular U.S. university ("University-5"). CC-5 answered affirmatively. LIU explained that his "original plan was to have [University-4] send an invitation" for the CAIEP-NY Hire, but that University-4 "is not cooperating with us" and no longer works with SAFEA's training division. He then asked CC-5 whether University-5 could assist with the CAIEP-NY Hire's visa. CC-5 responded, "I can try," and then mentioned another U.S. university as a second possibility ("University-6"). LIU

---

[7] Based on my review of Company-1's website, I am aware that Company-1 describes itself as "a professional consulting firm serving clients in both China and United States. As one of the overseas training institutions designated by State Administration of Foreign Experts Affairs of China (SAFEA), [Company-1] is committed to promoting exchanges and cooperation between China and United States in the fields of technology, education, management, and culture."

19

confirmed, "Either one will do." He then explained that the CAIEP-NY Hire "will not be attending classes. She may just go over there to pick up a subject to work on . . . and then, most of her time, she will stay here with me." The Woman then clarified, "So it's like she is here as a visiting scholar but she will actually stay in your place. Is that right?" LIU responded, "right, right, right." LIU stated that he would send the Woman and CC-5 the CAIEP-NY Hire's resume.

41. On or about May 31, 2018, ZHONGSAN LIU, the defendant, received a phone call from CC-5. During the call, LIU and CC-5 discussed LIU's request for assistance in securing a university sponsor for the CAIEP-NY Hire's J-1 visa application. CC-5 asked LIU how he intended to arrange matters after the CAIEP-NY Hire arrives in the United States. CC-5 explained that he planned on raising the matter with University-5 and University-6, and "[t]hey may ask." LIU replied that the CAIEP-NY Hire will "find an advisor here and she will do research on a subject that is related to her. And then she will assist me with my work here." LIU further stated that the CAIEP-NY Hire can visit the sponsoring university "every other week or . . . once a month." CC-5 replied that if "there is an important task, it will still be that . . . [CAIEP-NY] will need [the CAIEP-NY Hire]. Is that right?" LIU replied, "Yes, yes, yes, yes." LIU directed CC-5 to obtain a one-year visa for the CAIEP-NY Hire.

42. Later on or about May 31, 2018, ZHONGSAN LIU, the defendant, received another phone call from CC-5. CC-5 told LIU, in substance and in part, that University-5 had informed him that "according to the regulations of the State Department, and the regulations of the school," University-5 could only sponsor the CAIEP-NY Hire for a half-year period in the United States. CC-5 suggested that the CAIEP-NY Hire should go to University-5 first, and then he would contact University-6 to sponsor the CAIEP-NY Hire's visa "for another half year." LIU agreed with CC-5's proposal.

43. On or about June 1, 2018, ZHONGSAN LIU, the defendant, called CC-5 to continue discussing the CAIEP-NY Hire's visa. CC-5 reiterated that University-5 could sponsor the CAIEP-NY Hire's visa only for a six-month period in the United States. CC-5 informed LIU that he had told his contact at University-5 that the CAIEP-NY Hire may need to work at CAIEP-NY. LIU asked whether CC-5's University-5 contact might "have a concern" about sponsoring a visa for the CAIEP-NY Hire. CC-5 acknowledged that was "possible," and asked LIU to "wait for a couple of days . . . to see what [University-6] is going to say." LIU told CC-5, "It

20

will be the best scenario for sure if [the CAIEP-NY Hire] is offered one year." Based on my training, experience, and involvement in this investigation, LIU's question regarding University-5's "concern" about sponsoring a visa for the CAIEP-NY Hire appears to reference the fact that the CAIEP-NY Hire's primary purpose in the United States would consist of working at CAIEP-NY, rather than conducting research at University-5.

44. On or about June 14, 2018, ZHONGSAN LIU, the defendant, placed a phone call to a particular woman ("CC-6"). During the call, LIU asked CC-6, in substance and in part, how well she knew someone at a particular U.S. university ("University-7"), and whether "the visiting scholars" can "be invited" to University-7. LIU explained that "one of our colleagues will come over" to the United States. CC-6 requested clarification, and LIU explained that he was referencing someone who would "come to work at my location in the name of a visiting scholar." CC-6 asked, "Does that mean one person from SAFEA can be considered a visiting scholar and work here?" LIU explained that the visiting scholar "does not have to go to classes" and "doing . . . research is good enough"; for example, in the "human resources" or "cultural exchange" fields. CC-6 agreed to raise the matter with her contacts at University-7 at a meeting the next day. LIU stated that he was looking for a one-year invitation for the visiting scholar.

45. Based on my review of records maintained by CBP, I am aware that to date, the CAIEP-NY Hire has not entered the United States.

46. Based on my training, experience, and involvement in this investigation, including my review of the recorded phone calls and emails set forth above, it appears that in support of CC-1's 2018 Visa Application, CC-1 falsely represented to the U.S. Government that she was entering the United States for the primary purpose of conducting research pertaining to "the administration of nonprofits" at University-1, and that she would be residing at the Georgia Address (her "site of activity"). In truth and in fact, however, CC-1 worked full-time at CAIEP-NY's office located in the area of Fort Lee, New Jersey. It further appears that ZHONGSAN LIU, the defendant, participated in the conspiracy by taking measures intended to enhance CC-1's false appearance as a visiting Research Scholar at University-1; for example, by directing that CC-1 report to University-1 upon her arrival in the United States, by ensuring that CC-1 obtained a driver's license in the State of Georgia, and by instructing CC-1 periodically to visit University-1 while working full time at CAIEP-NY. *See supra*

21

¶¶ 21, 23-27. In addition, LIU took steps to enable the CAIEP-NY Hire to likewise obtain a J-1 visa under false pretenses by attempting to arrange for multiple universities to invite the CAIEP-NY Hire to come to the United States as a Research Scholar, despite knowing that the CAIEP-NY Hire's primary purpose in the United States would consist of furthering the PRC Government's talent-recruitment objectives by working full time at CAIEP-NY. *See supra* ¶¶ 32-44.

WHEREFORE, the deponent respectfully requests that a warrant be issued and that ZHONGSAN LIU, the defendant, be arrested and imprisoned, or bailed, as the case may be.

ERIN PROPERSI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
/3 th Day of September, 2019

THE HONORABLE THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

22